### Andrew S. Garr *v.* Selah Hill et al.

1. J. entered into a verbal agreement with M. that M. would convey to J., on the first of August, 1839, two lots of land, for a consideration specified. On delivery of the deed, J. should pay a specified portion of the consideration money, and give a bond and mortgage for the residue, payable in five years; or, provided, that by a day specified, J. should put improvements on the two lots, to the value of the cash payment specified, then M. agreed to take a bond and mortgage for the whole purchase money. J. entered under the agreement, went into possession, and commenced building. No conveyance was made to him under the agreement.

2. Subsequently, J. entered into an agreement under seal, which bears date the twenty-ninth day of August, 1839, in which, after reciting the verbal agreement above, J. agrees, for a consideration specified, to convey to W. all his right, title and interest in the said lots of land; and further agrees to discharge M. from all liability under his contract, provided M. would convey the said premises to W. upon the same terms he was to convey to J.

3. On the thirteenth day of September, an attachment was issued against M. as an absent and absconding debtor; under this attachment, the sheriff attached the lots mentioned, *and all the right, title and interest of J. in the same.*

4. On the twelfth of October, M. conveyed the lots to W. W. executed a mortgage to M. and entered. This mortgage was foreclosed. M. was the purchaser, and on the twentieth of November, 1841, the sheriff executed to him a deed.

5. On the eleventh oi December, M. conveyed to one of the defendants, H. H. went into possession, finished the buildings, and put considerable improvements on the lots.

6. On the twenty-ninth of July, 1843, nearly four years after the attachment was levied, the auditors made sale under the attachment, and conveyed to the complainants the interest of J. in the lots and improvements.

7. The bill prays that the lien of J. be established, and the complainant be decreed entitled to the property by virtue of his purchase.

8. *Held*—that the agreement of the twenty-ninth of August, was a legal transfer of all J.'s interest in the land, and M.'s consent was not necessary to make the transfer of J.'s interest complete. The agreement between J. and W. was complete and executed.

9. If J. had any interest *subject to attachment,* he had an interest he could part with without M.'s consent, and the *attachment subsequently issued and levied,* created no lien upon the land.

10. If a debtor is about to abscond from his creditors, and with this knowledge on the part of the purchaser, and with the view of aiding him to convert his property into funds, so that he may the more readily effect his purpose, he takes a conveyance of the debtor's property, *he participates in the fraud* the debtor contemplates perpetrating, and such conveyance *is void as against creditors.*

11. But a debtor in failing circumstances, or about to abscond, may legally make a conveyance for the purpose of preferring *an honest creditor.*

Bill filed September 8th, 1843.    The cause was heard upon bill, answer, replication and proofs.

The material facts disclosed by the pleadings and evidence are contained in the Chancellor's opinion.

*S. R. Hamilton* and *W. Halsted*, for complainant.

*P. Bentley* and *P. D. Vroom*, for defendants.

THE CHANCELLOR.   In the early part of 1839, Alfred F. James, then of Jersey City, in the county of Hudson, made a verbal agreement with the agent of Neal McLeod, of the city of New York, to this effect: That McLeod, on the first of August, 1839, would convey, by deed of warranty, to James, two lots of land in Jersey City, for the consideration of eight hundred dollars, for one lot, and one thousand dollars for the other.   On delivery of the deed, James should pay two hundred dollars on each lot, and give a bond and mortgage for the residue of the consideration money, payable in five years from the date thereof, with interest payable on the first day of May, in every year; or, provided, by the said first of August, the said James put improvements, by building, on the two lots, to the value of two hundred dollars on each, McLeod agreed to take a bond and mortgage for the whole purchase money, one thousand eight hundred dollars, payable on like terms.   James, under this agreement, went into the possession of the lots, and commenced building dwelling-houses upon them, but of what value does not appear, though one of the answers denies that they were of the value stipulated in the agreement.   No conveyance was made to James under this agreement.   On the twenty-ninth of August, 1839, James and David B. Wakeman entered into an agreement, under seal, and which agreement bears date August twenty-ninth, 1839, in which, after reciting the verbal agreement between James and McLeod, James agrees, in consideration of the sum of five hundred dollars, to convey to said Wakeman all his right, title and interest in the said lots of land, and further agrees to dis-

charge the said McLeod from all liability under his contract, provided McLeod would convey the said premises to Wakeman upon the same terms and conditions specified and agreed upon in their said verbal agreement.

On the thirteenth day of September, 1839, an attachment was issued out of the Common Pleas of the county of Bergen against McLeod, as an absconding debtor. Under this attachment, the sheriff attached this land and all the estate, right and interest of Alfred F. James in the same, and the same was inventoried and appraised at four thousand dollars.

On the twelfth day of October, McLeod conveyed the lots in question to Wakeman, and on the twenty-first of the same month Wakeman and wife executed to McLeod a mortgage to secure Wakeman's bond of one thousand eight hundred dollars. Wakeman entered into possession, and expended several hundred dollars upon the buildings which had been partly erected by James.

In the term of April, 1841, of this court, a foreclosure suit was commenced on the mortgage against Wakeman and wife, as the only defendants. A decree was obtained, and under it the property was sold. McLeod purchased it for the amount of the decree, two thousand one hundred and sixty dollars, and on the twentieth of November, 1841, the sheriff executed and delivered to him a deed.

On the eleventh of December, 1841, McLeod conveyed to one of the defendants, Selah Hill, the consideration expressed in the deed, being two thousand and two hundred dollars. Hill went into possession, finished the buildings, and has put considerable improvement on the lots.

On the twenty-ninth of July, 1843, nearly four years after the attachment was levied, the auditors made sale under the attachment, and conveyed to the complainant the interest of James in the lots and improvements for the sum of forty-one dollars.

The bill prays that the lien which existed on the said lots in favor of the said James may be established, and the complainant be decreed entitled to the same, by virtue of

his purchase, the complainant submitting to such terms, &c., as the court may direct.

McLeod being deceased, his executors were made parties defendants to the bill, and they and Selah Hill have severally answered. The cause comes up now for final hearing upon the pleadings and proofs.

The complainant has failed to establish the fact that the agreement between James and Wakeman, of the twenty-ninth of August, was antedated. Hill denies fully all knowledge, information or belief that it is so, and clears his conscience of any participation in a fraud, if any was practiced, in that transaction. The agreement is produced. There is nothing suspicious on the face of it. It is proved to be in the handwriting of the subscribing witness B. J. Vancleve, Esq., counselor-at-law, since deceased. If it was antedated, the only object must have been to represent the transaction as prior in point of time to the issuing of the attachment, so as to prevent James' interest being affected by a lien in consequence of that proceeding. This is charged, by the bill, to have been the object the parties had in view. But it is proved that Mr. John Cassedy, who was the agent of McLeod, and then residing at Hackensack, received by the hands of Wakeman, a letter addressed by James to Mr. Cassedy, informing him of the agreement with Wakeman. The letter is produced, and bears date the twenty-ninth of August, and Mr. Cassedy's impression is he received it either the day after, or a few days after its date. It appears also in evidence, that on the twenty-ninth of August, James confessed a judgment to Wakeman and his brother, thus showing that on that day they had transactions together in reference to accounts previously existing between them. There is no circumstance proved, from which the inference can fairly be drawn that the agreement was not executed on the day it bears date.

But it is insisted by the bill, and also by counsel in argument, that even if the said agreement was executed prior to the issuing and serving the attachment, it did not amount to a sale and conveyance *in presenti*, of the right, title and in-

terest of James in the premises, but was merely an executory contract binding James to convey the same, provided McLeod would agree to the substitution of Wakeman in the place of James; and the bill charges that McLeod did not consent to the substitution until after the service of the attachment. It is true, the only evidence as to the time when McLeod first consented to the substitution, was when he executed the deed, which was a short time after the attachment was issued. But McLeod being dead, it was not in the power of the defendants to show when his consent was first given. But I do not consider this material. The agreement of the twenty-ninth of August, was a legal transfer of all James' interest in the land. He sold his interest for the sum of five hundred dollars. There was nothing further for him to do, and no conveyance for him to execute. McLeod's consent was not necessary to make the transfer of James' interest complete. It is true, Wakeman might not have been able to compel McLeod to execute to him a deed upon the exact terms stipulated by the agreement; though he might have got the full benefit of it by paying the consideration, if McLeod refused to take his bond and mortgage as a substitute for James'. The agreement between James and Wakeman was complete and executed. Suppose McLeod had refused to execute the agreement with Wakeman, Wakeman could not have recovered the five hundred dollars back again from James. And if James had enforced against McLeod the execution of the agreement, James would have been a trustee for Wakeman. If James had, by virtue of his agreement with McLeod, any interest that was subject to attachment, he had an interest he could part with without McLeod's consent. If, therefore, the agreement was *bona fide*, and for a valuable consideration, the attachment subsequently issued and levied created no lien upon the land.

But it is further insisted that this agreement is void, because it was made and executed by James on the eve of his absconding from his creditors, in a state of insolvency, and for the purpose and object of putting his interest in the said property out of the reach of his creditors; and the bill

charges that at the time Wakeman was embarrassed in his circumstances, and unable to pay, and never did pay James the consideration mentioned, of five hundred dollars.

If the agreement was made by James for the purpose of defrauding his creditors, and Wakeman entered into the agreement to aid him in such purpose, the agreement is void, no matter whether Wakeman paid him a full consideration or not. A deed executed for the purpose of defeating creditors, in which purpose the grantee participates, is void, even though a full consideration is paid. So, if a debtor is about to abscond from his creditors, and with this knowledge on the part of the purchaser, and with the view of aiding him to convert his property into funds, so that he may the more readily effect his purpose, he takes a conveyance of the debtor's property, he participates in the fraud the debtor contemplates perpetrating, and such conveyance is void as against creditors. *Sexton* v. *Wheaton*, 1 *Am. Leading Cases* 64, 65. A deed must not only be for a full consideration, but it must be *bona fide*, if existing creditors are affected by it. *Story's Eq.*, § 369, and cases there cited. This is very different from a debtor in failing circumstances, or about to abscond, making a conveyance for the purpose of preferring an honest creditor. This he may legally do. *Story's Eq.*, § 370. The allegation that Wakeman did not pay any consideration, is not proved, or sustained by any circumstance giving the slightest ground for such an inference. The complainant might have made Wakeman a defendant, and have had the benefit of a discovery from him, or he could have used him as a witness. It was not necessary for Selah Hill to sustain his title, except by his denial of any participation in the alleged fraud, even if a fraud in the transaction between James and Hill could affect Hill's title, until the complainant, by some evidence, impeached that transaction. If there was anything in the fact of James' absconding so soon after his making the agreement with Hill, as to make it necessary for the defendant Hill to show that Wakeman was not in embarrassed circumstances, as charged in the bill, and that he did

pay a valuable consideration, which the bill denies, the complainant has, by testimony introduced by himself, relieved the defendant of the necessity of making such proof.

Samuel Cassedy, Esq., a witness on the part of the complainant, testifies that, although Wakeman was sued about this time, he had "a good deal of means." "He carried on a good deal of business, and had always considerable means in his hand, and has still." And the complainant recalling his attention to this matter, on a re-examination, he says, "From what I knew of Mr. Wakeman's circumstances, I supposed Mr. Wakeman could pay the sum of five hundred dollars at that time." And in further reply to interrogatories of complainant, he says, "I don't know what Mr. James made that paper for; I think it is probable that Mr. Wakeman had Mr. James charged with the lumber to build those houses with, and that, together with his liability as bail of Mr. Wakeman for Mr. James, deponent thinks were the inducements to make the paper Exhibit B—which is the agreement—on the part of defendants." With this evidence on the part of the complainant, Hill was entirely relieved from any necessity of proving anything as to the consideration between Wakeman and James, or the pecuniary circumstances of James at that time.

With this view of the case, it is unnecessary for me to decide other questions discussed on the argument—whether the nature of James' interest in the land was such as is subject to attachment? whether the attachment in the form it was made, the return being of all his interest in the land, and not in the agreement with McLeod, and the appraisement being of the land, was an attachment of James' interest in the agreement? or the more important question—whether, if the agreement between James and Wakeman was antedated, and the deed between them made to defeat and defraud creditors, the title of the defendant Hill is affected by such fraud, under the peculiar circumstances of this case?

There is no peculiar equity in the complainant's case. He was the attorney of the plaintiffs in attachment. He

purchased this property on speculation, with full knowledge of all the facts, and at a mere nominal price.

The defendant is a *bona fide* purchaser, for a full consideration, and without notice of any of the facts and circumstances alleged by the complainant as impugning his title. He exercised all the diligence and care that the most cautious and prudent man could do in making a purchase. He made inquiry as to matters not on record, to the sources from whence information could be derived, and employed competent counsel to examine the title and prepare the deeds. He has put expensive improvements on the property, and in the most public manner, and without a hint from any one, that his title could be questioned, and this was done in the very neighborhood where the complainant, who was the attorney for the plaintiffs in the attachment, resided.

The bill must be dismissed, with costs.